IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs July 26, 2000

## JOSEPH LEBRON DERRICK v. STATE OF TENNESSEE

**Direct Appeal from the Criminal Court for Hamilton County**
**No. 222369      Stephen M. Bevil, Judge**

_____

**No. E1999-02646-CCA-R3-PC**
**December 28, 2000**
_____

The Defendant was convicted by a Hamilton County jury of second degree murder and was sentenced to twenty-years incarceration. On direct appeal, this Court affirmed his conviction and sentence, and the Tennessee Supreme Court denied permission to appeal. The Defendant subsequently filed a post-conviction petition, alleging that he was denied his right to effective assistance of counsel and his right to a fair trial. The post-conviction court denied post-conviction relief. We conclude that the Defendant was denied neither his right to effective assistance of counsel at trial nor his right to a fair trial. Accordingly, we affirm the judgment of trial court denying post-conviction relief.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which JOSEPH M. TIPTON and JOHN EVERETT WILLIAMS, JJ., joined.

Mike A. Little, Chattanooga, Tennessee, for the appellant, Joseph Lebron Derrick.

Paul G. Summers, Attorney General and Reporter; Patricia C. Kussman, Assistant Attorney General; William H. Cox, III, District Attorney General; and Barry A. Steelman, Assistant District Attorney General; for the appellee, State of Tennessee.

**OPINION**

On June 28, 1995, a Hamilton County jury found the Defendant, Joseph Lebron Derrick, guilty of second degree murder. The trial court sentenced him as a Range I standard offender to twenty-years incarceration. On direct appeal, this Court affirmed the Defendant's conviction and sentence, and the Tennessee Supreme Court denied permission to appeal. See State v. Joseph Lebron Derrick, No. 03C01-9601-CR-00036, 1997 WL 148563 (Tenn. Crim. App., Knoxville, Apr. 1, 1997).

The Defendant subsequently filed a <u>pro</u> <u>se</u> petition for post-conviction relief, in which he alleged that he was denied his right to the effective assistance of counsel at trial and his right to a fair trial. The trial court appointed counsel to represent the Defendant in his post-conviction proceedings, and the Defendant filed an amended petition for post-conviction relief. The Defendant next filed a motion requesting the recusal of the judge handling his case, and the trial court granted the motion. The trial court then conducted a post-conviction evidentiary hearing, after which it denied post-conviction relief. The Defendant now appeals the trial court's decision, arguing (1) that he received ineffective assistance of counsel at trial, and (2) that he was denied his right to a fair trial. Finding no error in the record before us, we affirm the judgment of the trial court denying post-conviction relief.

On direct appeal, this Court summarized the facts of this case as follows:

The [Defendant] and the victim were patrons at a nightclub in Chattanooga the night of the incident, June 11, 1994. The two became involved in an altercation. The bouncers at the club separated the two men, and they made the [Defendant] leave the club. The victim soon decided to leave the club as well. The [Defendant] was waiting outside the club. The [Defendant] either was handed a gun or picked one up off of the ground, and began chasing the victim through a parking area while shooting at him. The victim was shot and killed in the parking area. The [Defendant] left the scene in a car, and he turned himself in when he heard his name in connection with the victim's death on the television.

<u>Id.</u> at *1.

At the post-conviction hearing, the Defendant summarized the errors that he believed his trial attorney had made. He first complained that the time which he spent with his attorney prior to trial was insufficient. He testified that he met with him approximately five times prior to trial. He stated that each meeting lasted approximately forty minutes to one hour and that he was able to communicate with his attorney during these meetings. However, the Defendant complained that he had to wait fifteen to twenty minutes in his attorney's waiting room prior to each meeting and that during each meeting, he was asked to recount his version of the events on the night of the crime.

The Defendant next alleged that his attorney did not properly communicate with him prior to trial. He claimed that counsel never provided him a copy of his indictment and never discussed the indictment with him. The Defendant further claimed that his attorney failed to inform him of the potential range of punishment for first degree murder or any lesser-included offenses, with the exception of voluntary manslaughter. The Defendant testified that his attorney did discuss some trial strategy with him, but allowed him no input. He testified that the only items of evidence obtained through discovery that his attorney shared with him were the victim's autopsy report and information concerning gun shells found at the crime scene. In addition, the Defendant complained that counsel did not show him a video tape of the crime scene prior to trial. He stated that had counsel done so, he could have pointed out that certain blood stains on the concrete in the parking lot where the shooting occurred may have been oil spots; however, the Defendant presented no evidence to support this contention.

According to the Defendant, his attorney should have filed a pretrial motion to suppress evidence of the shells found at the scene. The Defendant testified that four spent gun shells were found at the crime scene and that only two of the shells "match[ed] each other." He asserted that for this reason, his attorney should have filed a motion to suppress evidence of all the shells.

The Defendant admitted that his attorney did conduct some pretrial investigation, but claimed that the investigation was insufficient. The Defendant reported that he provided counsel with a list of witnesses, but he stated that counsel could not locate them. The Defendant testified that he therefore brought three witnesses to his attorney's office. He recalled that the attorney spent approximately thirty minutes interviewing each witness. In addition, the Defendant complained that his attorney allowed him no input in deciding which witnesses to call at trial and did not discuss with him three motions filed by the State to add witnesses.

The Defendant testified that his attorney also failed to effectively represent him during jury selection. The Defendant maintained that he saw a potential juror smile and wave at the victim's mother during voir dire. The Defendant claimed that he requested that the woman be taken off the panel, but that counsel chose not to remove her. The Defendant also complained that counsel did not request that the jury be sequestered.

With regard to his representation at trial, the Defendant alleged numerous errors by his attorney. First, the Defendant stated that trial counsel should have objected to testimony concerning the victim's autopsy on the basis that the doctor testifying did not actually conduct the autopsy and on the basis of the doctor's qualifications. The Defendant next complained that trial counsel objected only four times during the course of a two-day trial. He also reported that at the end of the first day of trial, his attorney was not prepared to proceed with the defense proof, so court was adjourned at three o'clock p.m. The Defendant further alleged that his attorney failed to effectively cross-examine State witnesses and failed to bring out inconsistencies in their testimony. The Defendant stated that counsel failed to call a crucial witness, Robert Morgan, whom he maintained would have testified that the Defendant and the victim were put out of the bar at the same time on the night of the shooting. In addition, he testified that his attorney did not call any witnesses who, contrary to testimony by State witnesses, would have testified that the Defendant did not shoot the victim after the victim was lying on the ground. Finally, the Defendant complained that counsel failed to challenge the integrity of the crime scene and failed to object to testimony by a detective about the velocity of blood droplets found at the scene.

The Defendant also found fault with his attorney's representation during post-trial proceedings in his case. He claimed that counsel failed to file a motion regarding mitigating factors prior to the sentencing hearing and failed to object at the sentencing hearing to the trial court's use of prior misdemeanor convictions as enhancement factors. The Defendant also claimed that his attorney did not object to an inappropriate comment by the trial judge at the sentencing hearing and did not introduce the comment as an issue in his motion for new trial. Additionally, he complained that his attorney failed to include as an issue in his motion for new trial the fact that the jury was

allowed to view a video tape of the crime scene twice; the Defendant admitted, however, that counsel did object at trial to allowing the jury to see the tape twice.

Finally, with regard to his claim that he did not receive a fair trial, the Defendant pointed out a comment made by the trial judge at the sentencing hearing. The comment, which is included in the record of the sentencing hearing, was made by the judge at the conclusion of the hearing. The trial judge stated,

> I think it really is tragic because in this situation, Ms. Slater has lost a son, a young man, a fine young man and now Mr. Derrick who probably isn't all that bad a person has just wasted his life or a large part of his life because somebody handed him a gun. If it had remained a fist fight Mr. Timothy Slater would still be alive and Mr. Joseph Lebron Derrick wouldn't be in court. <u>Somehow or another young males, especially young black males have got to realize that you don't have to prove you're a man by killing somebody</u>. . . . [Y]ou waste your life when you do that.

(Emphasis added.)

Eddie Jacks, an investigator for the Public Defender's office at the time of the Defendant's trial, also testified at the post-conviction hearing. He revealed that he assisted trial counsel with the Defendant's case and stated that he and the attorney "spent a great deal of time" working together on the case. Jacks maintained that he interviewed some defense witnesses and all of the State's witnesses, with the exception of one witness who refused to talk to him. Jacks recalled that none of the witnesses provided information that corroborated the Defendant's version of the events on the night of the crime. Jacks reported that he taped all witness interviews and later played the tapes for the Defendant's attorney, who was visually impaired. Jacks also reported that he went to the crime scene, interviewed an employee of the bar, obtained witness names, and attempted to find the witnesses, whom he ultimately was unable to contact. He testified that he interviewed Robert Morgan, but could not remember the details of their conversation. However, he stated, "I do recall that no witnesses that I talked to would corroborate . . . [the Defendant's] theory of the case . . . [T]he stories didn't match up." Jacks testified that on the day of trial, he was trying to find witnesses whose names the defense had just received from the Defendant.

The Defendant's trial counsel also responded to the Defendant's allegations at the post-conviction hearing. He testified that he had been practicing law since 1980 and that he had worked at the Public Defender's office since 1989. He stated that he had tried numerous first degree murder cases prior to defending the Defendant.

Contrary to the Defendant's testimony, the attorney maintained that an investigator from his office gave the Defendant a copy of his indictment at the arraignment. He emphasized that it had been a practice of his office since July of 1992 for an investigator to show each defendant a copy of his or her indictment at the arraignment. He also testified that during his first meeting with the Defendant, he explained to the Defendant that he was charged with first degree murder and that the penalty for the offense is life imprisonment. The attorney reported that he also "explained all lesser included offenses along with the ranges of punishment . . . and the defenses, the defense of self

defense, and inquired as to his prior records and attempted to establish a range of punishment [in order to] tell him what he was looking at regarding punishment if he was convicted." He stated that he followed this procedure with each defendant he represented.

Counsel testified that during their initial interview, he listened to the Defendant's version of the events at issue and obtained as many witness names as possible from the Defendant. He recalled that initially, the Defendant did not have the names of all witnesses. He reported that he had to call the Defendant more than once to remind him that they needed witness names. Counsel stated that the Defendant did bring three witnesses to his office, whom he interviewed and whom he called at trial. However, he maintained that the Defendant did not come up with the names of all possible witnesses until the day of trial, forcing Eddie Jacks to attempt to locate some witnesses on that day.

Counsel testified that he may have asked the Defendant more than once to share his version of the shooting so that he could develop a clear understanding of the Defendant's version of the events in order to compare it to information received in discovery. With regard to items received in discovery, the attorney stated that the defense "received pretty much an open file" in the Defendant's case. He testified that he went to the attorney general's office prior to trial to review pictures and a video tape; he stated that because he is visually impaired, an assistant at the attorney general's office described both the pictures and the video footage to him. He reported that all written documents received in discovery were taped on an audio tape for his review. Counsel also recalled that he also visited the crime scene prior to trial.

The Defendant's attorney stated that he did not file a motion to suppress evidence regarding shells found in the parking lot that were not fired from the Defendant's gun because he "wanted the jury to know that there were shells already in the parking lot before this alleged incident . . . ." in order to create reasonable doubt as to whether the Defendant had fired all of the bullets. He stated, "I think that had I moved to suppress [evidence of the shells] . . . it would have been more detrimental to [the Defendant] than helpful." In addition, counsel testified that he "didn't feel it was relevant to attack the integrity of the crime scene" in this case.

Counsel further testified that he elected not to play for the jury a 911 tape made on the night of the shooting. He explained that the 911 caller, apparently a patron or employee of the bar where the altercation between the Defendant and the victim began, stated that no weapons were involved in the dispute. He stated that this contradicted testimony by other defense witnesses who testified that the victim hit the Defendant with a beer bottle during their fight.

> With regard to the Defendant's allegations concerning jury selection, counsel testified, I don't independently recall [the Defendant] having a problem with a potential juror but I know that my practice in that regard is anytime [sic] a defendant insists in [sic] striking a juror I do because it's their jury. Sometimes I will ask them why do they want to strike them and I will give the defendant my view as to why we maybe should keep them, then if the defendant says strike anyway I strike them, if the

defendant says I'll leave it up to you then I use my best judgment. . . . That is what I did in this case.

Concerning the sequestration of the jury, the attorney testified, "I seem absolutely sure I followed my custom [in the Defendant's case], it's my custom to always ask the defendant if they want a jury sequestered or not especially in a first degree murder case." He further testified that the Defendant did not express any concern about the news coverage of his case.

The Defendant's attorney testified that he stipulated the qualifications of Dr. King, who testified concerning the victim's autopsy, and chose not to object to King testifying about the autopsy because he believed King's testimony helped the defense more than testimony by the doctor who actually performed the autopsy would have helped. He maintained that King "was a State's witness that . . . at worse was not going to hurt [the defense] and at best might . . . help[]" the defense. He also recalled that King's testimony was consistent with the autopsy report.

Counsel stated that he did not object to blood droplet evidence because he did not have a proper ground upon which to object. He stated, "It's my personal theory that if I object and I'm overruled that hurts my client." He also explained that the defense was not contesting the fact that the Defendant shot the victim, but rather that they were attempting to establish that the Defendant had acted in self-defense. However, he reported that the defense was unable to find any witnesses to support the Defendant's claim that he had acted in self-defense. The attorney further reported that the defense could not find one witness who recalled seeing the Defendant pick up from the ground the gun with which he shot the victim, as the Defendant claimed he had done.

Counsel was also questioned about a memorandum which the State claimed to have obtained from the Defendant's defense file concerning a potential witness named "Curnice." The memorandum, entered into evidence as an exhibit at the post-conviction hearing, states, "Curnice could be an important witness to substantiate the theory that Derrick did not mean to kill the victim." According to the memorandum, Curnice would have testified that the Defendant and the victim fought only inside the bar, that the Defendant had a black eye, that he did not see anyone hand the Defendant a gun, and that the Defendant was "just shooting at the victim to scare him." The memorandum also stated that Curnice was unwilling to testify in court. In response to questioning, the attorney reported that he did not recall the memorandum. He admitted that, hypothetically, Curnice may have provided helpful testimony for the defense. However, he pointed out that according to the memorandum, Curnice's full name was unknown, and there was no indication in the memorandum of how to contact him.

Counsel testified that he was not prepared to proceed with proof for the defense after the first day of trial because Eddie Jacks was still searching for the witnesses whose names the Defendant had supplied on the day of trial. He confirmed the Defendant's testimony that he spent at least thirty minutes with each of the defense witnesses who were located before trial. He also testified that he listened to a tape of Robert Morgan's interview with Eddie Jacks and a tape of his statement to police. According to the Defendant's attorney, although Morgan said that the Defendant and the

victim were put out of the bar at the same time on the night of the shooting, as the Defendant contended, Morgan also stated that after the Defendant left the bar, someone handed him a gun. The attorney maintained that he opted not to call Morgan as a witness because Morgan's statement that someone handed the Defendant a gun contradicted the Defendant's contention that he found the gun on the ground. He concluded, "The bad outweighed the good, in my opinion . . . ."

Counsel stated that the Defendant made an informed decision to testify. He explained, "[I]n most self defense cases it's important for a defendant to testify. In this case it was crucial because [the Defendant] was the only one that could describe the fight outside in the street and the gun appearing in the street which [the Defendant] assumed came from [the victim]."

Finally, counsel addressed the Defendant's allegations concerning the sentencing hearing. He stated that he made arguments about possible mitigating and enhancement factors at the hearing. He recalled the judge's comment that "young males, especially young black males have got to realize that you don't have to prove you're a man by killing somebody." Although he characterized the comment as "insensitive," the attorney said that he did not object to the comment because he did not "know that you can object to what a judge says." He reported that he did not raise the issue of the judge's comment on appeal because he "didn't think it was important"; he explained,

> What I really think . . . is back at that time before and possibly even at this time back before the Sentencing Reform Act of 1989 we had five years that were tacked on to a sentence if a firearm was used in the commission of a felony, any felony, and it's my personal feeling . . . that judges often still tack that on, that's why I think [the Defendant] got [twenty] years instead of [fifteen years] because of the way the firearm was used in the commission of the offense. . . . I don't think that judges punish defendants too much for [a] misdemeanor record.

On cross-examination, the attorney was questioned about a remark that he made during a jury-out hearing at trial, which the Defendant pointed out in his initial post-conviction petition. During the jury-out hearing, counsel stated, "Sorry about these dates, Judge, I'm trying too many cases." When questioned at the post-conviction hearing about the comment, counsel responded,

> I don't recall saying that. If I said it it wasn't an excuse or it wasn't to be used as an excuse like I've not put enough effort in this case because . . . I listened to every scrap of evidence there was . . . . I brought out favorable stuff for [the Defendant], I cross examined the witnesses on many inconsistencies if not each and every one, so I think it's pretty obvious I was well prepared from the discovery to try this case.

Counsel also stated that he may have made the statement in jest.

In addition, the Defendant's attorney admitted on cross-examination that he did not impeach the credibility of one or two State witnesses on the basis that they were friends with the victim. He stated that he did not challenge police officers concerning blood spots found in the parking lot where the shooting occurred because he had no evidence indicating that the spots were anything other than blood spots.

## I. INEFFECTIVE ASSISTANCE OF COUNSEL

The Defendant argues that he should be granted post-conviction relief because he received ineffective assistance of counsel at trial. In order to obtain post-conviction relief, a petitioner must show that his or her conviction or sentence is void or voidable because of the abridgment of a constitutional right. Tenn. Code Ann. § 40-30-203. The petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence. Id. § 40-30-210(f). A post-conviction court's findings of fact are afforded the weight of the jury and are conclusive on appeal unless the evidence in the record preponderates against those findings. Henley v. State, 960 S.W.2d 572, 578 (Tenn. 1997). However, review of a trial court's application of the law to the facts of a particular case is de novo. Ruff v. State, 978 S.W.2d 95, 96 (Tenn. 1998).

The right of a criminally accused to representation is guaranteed by both the Sixth Amendment to the United States Constitution and Article I, Section 9 of the Tennessee Constitution. State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999); Baxter v. Rose 523 S.W.2d 930, 936 (Tenn. 1975). This right to representation includes the right to "reasonably effective" assistance. Burns, 6 S.W.3d at 461. The Tennessee Supreme Court has held that the issue of ineffective assistance of counsel is a mixed question of law and fact, and, as such, is subject to de novo review. Id.

In reviewing a claim of ineffective assistance of counsel, this Court must determine whether the advice given or services rendered by the attorney are within the range of competence demanded of attorneys in criminal cases. Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). To prevail on a claim of ineffective assistance of counsel, a petitioner must show that "counsel's representation fell below an objective standard of reasonableness," Strickland v. Washington, 466 U.S. 668, 688 (1984), and that this performance prejudiced the defense, resulting in a failure to produce a reliable result. Id. at 687; Cooper v. State, 849 S.W.2d 744, 747 (Tenn.1993). To satisfy the requirement of prejudice, a petitioner must show a reasonable probability that, but for counsel's unreasonable error, the fact finder would have had reasonable doubt regarding the petitioner's guilt. Strickland, 466 U.S. at 695. This reasonable probability must be "sufficient to undermine confidence in the outcome." Id. at 694; see also Harris v. State, 875 S.W.2d 662, 665 (Tenn. 1994).

When evaluating an ineffective assistance of counsel claim, the reviewing court should judge the attorney's performance within the context of the case as a whole, taking into account all relevant circumstances. Strickland, 466 U.S. at 690; State v. Mitchell, 753 S.W.2d 148, 149 (Tenn. Crim. App. 1988). The reviewing court must evaluate the questionable conduct from the attorney's perspective at the time. Strickland, 466 U.S. at 690; Cooper, 849 S.W.2d at 746; Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982). In doing so, the reviewing court must be highly deferential and "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Burns, 6 S.W.3d at 462. Counsel should not be deemed to have been ineffective merely because a different procedure or strategy might have produced a different result. Williams v. State, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980).

At the conclusion of the post-conviction hearing, the post-conviction judge in this case made extensive findings, including the following:

Of course you [have] got to start from the proposition that this wasn't a case where there were [sic] some question as to the identity of the assailant. From the very beginning, as [the Defendant's attorney] pointed out, . . . there was no question as to whether or not [the Defendant] shot [the victim] in this case, and the only question was to what degree of homicide this shooting would have been, . . . [counsel] [] sort of was boxed into his defenses, he didn't have a lot of choice as to what his defenses would have been. And, so, he chose to rely on the defense of self defense and not only self defense by possibly a reduction from first degree murder to voluntary manslaughter which looking at the proof before the jury was a good decision and, so, doing that tried to bring out those strong points to the defense as opposed to the negative points . . . Mr. Jacks testified that he interviewed every State's witnesses [sic]. [The attorney and Jacks] interviewed the[] witnesses that [the Defendant] brought into [the attorney's] office and every witness that he told them about that they could find they interviewed and they could not find any of these witnesses that would corroborate [the Defendant's] theory of the case.

As a matter of fact, some of the witnesses may have given some testimony that might have been helpful to [the Defendant] but by the same token they would have also given testimony that would have been damaging to [the Defendant], so that put [the Defendant's attorney] on the horns of a dilemma. . . . And he had to make a [judgment] call and he opted not to risk the more damaging testimony . . . .

So those are judgment calls and the Court finds that there was no ineffectiveness on [the attorney's] part by making the [judgment] calls that he did in light of the evidence that he had to work with.

The post-conviction judge also found that trial counsel and Jacks were forced to seek certain witnesses on the day of trial because the Defendant failed to provide them information about the witnesses until that day. The trial judge concluded that the Defendant's attorney, "[i]n an effort to fully represent" the Defendant, tried to locate the witnesses on the day of trial to determine "if in fact they did have testimony that would have been beneficial to [the Defendant]."

The judge also concluded,

I don't find any significance on [sic] the fact of [trial counsel's] statement, "Judge, I've got too many cases," because the public defender does have a lot of cases, they had a lot of cases at that time, they've got a lot of cases now, but my observation is that I've not seen it effect [sic] in anyway [sic] the effectiveness [of] the public defender's office . . . . They do a very good job, they've got investigators that go out and talk to these people, and I'm sure that was a comment made by [trial counsel] in the trial in the heat of battle, an off-the-cuff statement that certainly this Court doesn't find had any direct bearing on his effectiveness as a lawyer.

-9-

Concerning counsel's choice of defense witnesses and his cross-examination of State witnesses, the post-conviction judge stated,

> Robert . . . Morgan, the witness who may have said that he was not trying to kill him or whatever, he saw him, they were both kicked out the club at the same time, some of his testimony would have . . . possibly . . . called for a conclusion on his part so it may not be admissible, but [trial counsel] said he didn't call him as a witness because there again it was a judgment call because he said he would have had a weapon, so there's one of the things he was trying to avoid.
>
> Failure to cross examine the witnesses as to bias and friendship, sometimes that can help you and sometimes it can hurt as a trial lawyer, and again, it's a judgment call as to how far you go in trying to make that point. Other times if you question a witness about [being] a friend of the victim . . . , that's all that needs to be done because sometimes it plants a seed in the juror's mind that well, maybe these are close friends and maybe they do have a reason. So the . . . extent of that cross examination as to bias is again something that's left up to the individual.
>
> I don't think that these things that [trial counsel] is alleged to have done or neglected to do, maybe they should have been done differently, maybe another attorney would have done them differently but when I look a the overall proof in this case and, of course, [trial counsel] did, this Court feels like [he] did do a good job [by] getting this charge reduced from first degree murder to second degree murder and I think [the Defendant's] primary complaint is not that [trial counsel] didn't do an effective job, but basically he's more dissatisfied with the jury's verdict than [his attorney's] performance . . . I think if the jury had come back with a verdict of voluntary manslaughter rather than second degree murder that he wouldn't have had any complaint and we wouldn't be here today hearing this post conviction.

In conclusion, the post-conviction judge stated,

> In looking at the totality of the circumstances . . . in this particular case I don't find that [the Defendant] has shown that [his attorney] acted ineffectively or that his effectiveness wasn't within the range, normal range of competence demanded by attorneys in criminal cases, and that even if . . . things . . . should have been done differently there's no showing that more probably than not those things would have affected the outcome of the case.

Having thoroughly reviewed the record in this case, we conclude that the Defendant received the effective assistance of counsel at trial. As stated above, the trial court found that trial counsel's performance was within the normal range of competence demanded of attorneys in criminal cases, and we conclude that the evidence in the record does not preponderate against the trial court's findings. After considering the evidence presented at the post-conviction hearing, the trial court apparently accredited trial counsel's testimony over that of the Defendant. Other complaints by the Defendant concern strategic decisions by his attorney, which we may not second-guess on appeal. See Hellard, 629 S.W.2d at 9. We thus conclude that the Defendant has failed to show that his

attorney's performance "fell below an objective standard of reasonableness." Strickland, 466 U.S. at 688.

Furthermore, the Defendant has failed to show prejudice resulting from his counsel's alleged errors. As the trial court noted in its findings, neither the Defendant nor his attorney was able to locate any witnesses that could corroborate the Defendant's theory of the case. Considering all relevant circumstances and viewing counsel's conduct from his perspective at the time of trial, we conclude that the Defendant was not denied his right to the effective assistance of counsel at trial.

## II. RIGHT TO FAIR TRIAL

The Defendant next contends that he was denied his right to a fair trial and due process. He bases this claim solely on the trial judge's comment at his sentencing hearing that "young males, especially young black males have got to realize that you don't have to prove you're a man by killing somebody."

The post-conviction judge addressed the Defendant's complaints about the sentencing hearing as follows:

> As to the sentencing and Judge Meyer's remark, I'm looking at that remark in that somehow or another young males, and especially young black males, that was sort of an aside that he made, just a statement commenting on society in general and the number of shootings that occur particularly among young males, and the fact that when he said especially young black males going back over the records there are a lot of needless deaths in the black community because people do carry guns, . . . so I don't think he's commenting to the extent that at least in this Court's opinion that that statement certainly would have effected [sic] his sentencing in this case because the sentence was what would [now] be the presumptive sentence in a second degree murder case. It was 20 years which is the mid range between 15 to 25 which is now the presumptive sentence, although at that time it wasn't the presumptive sentence, the Court did find enhancement factors that outweigh the mitigating factors so I don't find that the sentence is excessive in light of the nature of the case, and . . . [the] sentence doesn't appear to be based on any kind of bias or prejudice or inflammatory . . . feeling. It think it's just a statement better left unsaid but it certainly doesn't appear to this Court that that statement in anyway [sic] had any affect [sic] on the sentence . . . . [T]he things that the judges have to consider, of course, are the enhancement factors as well as the mitigating factors and the nature of the case.

On direct appeal, this Court affirmed the sentence imposed by the trial court, concluding that a twenty-year sentence "is proper in this case where there are three enhancing factors and two

mitigating factors." See id. at * 5.[1] The three enhancement factors applied in this case were that the Defendant has a previous history of criminal behavior, that the Defendant used a firearm in the commission of the offense, and that Defendant did not hesitate to commit the crime when the risk to human life was high. See id. at *4; Tenn. Code Ann. § 40-35-114(1), (9), (10). The trial court found as mitigating factors that the Defendant lacked substantial judgment in committing the offense because of his youth and that he was supporting his child. See Joseph Lebron Derrick, 1997 WL 148563, at *4; Tenn. Code Ann. § 40-35-113(6), (13).

The trial judge's statement at the sentencing hearing, though arguably inappropriate, does not appear to have affected the Defendant's sentence. As the post-conviction court concluded, the trial judge appeared to be "commenting on society in general," rather than on the Defendant's specific actions. More importantly, however, as this Court concluded on direct appeal, the trial judge relied on appropriate enhancement and mitigating factors in sentencing the Defendant and imposed a proper sentence. The implication by the Defendant that the trial court relied on an improper factor in sentencing him and that the trial court was biased against him during the course of the trial is purely speculative. We therefore find this issue to be without merit.

Accordingly, we AFFIRM the judgment of the trial court denying post-conviction relief.

_____

ROBERT W. WEDEMEYER, JUDGE

---

[1] We also rely on a transcript of the sentencing hearing for our review, which the Defendant included in the record as an exhibit to the post-conviction hearing.